Good afternoon, everyone. As you know, we're here for oral argument following the remand of this matter from the Supreme Court on the common law immunity issue. And we received the supplemental briefing from both sides. As you can see, our colleague Judge Cabranes is joining us on Zoom. Judge Cabranes, are you able to hear everybody okay? Yes. Can you hear me? Yes. All right, great. So we will proceed. We have Mr. Williams for Hawk Bank. You reserve three minutes for rebuttal. You can begin whenever you're ready, Mr. Williams. Thank you and good afternoon, Judge Bianco, members of the panel. John Williams from Williams & Connolly on behalf of Turkia Hawk Bankazi, more commonly known as Hawk Bank. May it please the court. As Your Honor just stated, the Supreme Court remanded this case for consideration of the common law of sovereign immunity. That body of law resolves this case based on two principles. The first is that sovereign immunity from criminal prosecution is and always has been in this country absolute. That principle derives from Schooner Exchange, the foundation of sovereign immunity both in this country and in many ways around the world. Let me just, before we get to the criminal side of the equation, let's see if we can agree that a common law based upon, and we can go through the Supreme Court cases, but they're all in the Schooner Exchange, Berlin, which we cited, Hoffman, Peru, in our court, Victory Transportation, Mattar, Ruggiero, have all said a common law deference the executive on sovereign immunity in several cases. Agree? With an important caveat, Judge Bianco, which is that when you actually look at, to my mind, the high watermark of deference in civil cases, which to us is the Hoffman decision, it's actually circumscribed even there. It's circumscribed in this way. I'm reading from page 324 U.S. at 35 of the Hoffman decision. It is therefore not for the courts to deny an immunity which our government has seen fit to allow or to allow an immunity on new grounds which the government has not seen fit to recognize. And so that language, we think, identifies deference on sovereign immunity issues. There's two issues, though, Mr. Williams. First is cases following that don't have that caveat new grounds, for example, Verlinden, again, which we cited. The Supreme Court said this court consistently has deferred to the decision of the political branches, in particular those of the executive branch, on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities. So our cases don't have the new grounds caveat that existed in Hoffman. But more important than that, I guess my question to you is why isn't this a new ground? I'm putting aside the issue of indicting the state itself, which I think the government would concede is clear from the common law that you can't indict the state. What common law is there to suggest in the criminal context that you cannot indict an instrumentality of the state, a corporation, a bank, that's controlled by the state but is engaged in commercial activity? Where in the common law does it say that the government cannot do that? So I've got three points I'd like to make in response to that, Your Honor. At the end, if possible, I'd like to speak again to the deference point. But to begin with, I'd like to address, obviously, the heart of your question. So your question is where within the common law of immunity does absolute immunity apply to an instrumentality owned and possessed by the government? And our answer is, first, absolute immunity is reflected in Schooner Exchange, in the holding of the Coleman v. Tennessee case, which provided absolute immunity to a Union soldier from a murder conviction following the Civil War, and in numerous holdings of cases around the world and other treatises. So that's the question of – I'm sorry, Your Honor. Go ahead. That involves someone in the Army. We're not talking about that type of scenario. The cases I think that are cited in the brief are situations where the government – it's basically the government operating the entity, whether it be the Army or the ships or something like that. There is no case – you can correct me if I'm wrong – even around the world. I think the only case is the French case in 2004 that involved flagging vessels. That's the only case that anybody has cited that deals with this type of situation involving a corporation, a bank engaged in commercial activity where they're owned by the government. Isn't that the only case, the French case, in the history of the world? Well, the lack of cases in the history of the world we think actually strongly supports our side, Judge Bianco. It's notable – No, because then this is new grounds. This is new grounds. We've been extending immunity to commercial entities, banks. Suppose you have – let me give you a hypothetical. Suppose you have a bank controlled by the government that is funneling money to a terrorist organization, overtly funneling money to a terrorist organization that's killing Americans. I think you would say to us that the United States government, the Department of Justice, has no ability to indict that bank, even though they're overtly funneling money to a terrorist organization that's killing Americans. Isn't that what your position is today? Without intervention by Congress, yes, that is our position today. But with two important caveats that I'd like to get to that I was trying to answer before when I gave you my three principles, Your Honor. So the first principle was absolute immunity. I understand your thoughts on that. But the second is that the Supreme Court guidance on when an instrumentality is entitled to its sovereign's immunity is very clearly stated, even in the Hoffman case, and in Ex parte Peru, and in the Navamar, and in Berizzi Brothers. That standard is merely requiring ownership and possession. And those standards are clearly met here. There's no question within the context of this case, the government alleges it affirmatively that Hawk Bank is owned and possessed by the Turkish state. And so that resolves the instrumentality issue as a matter of clear, established Supreme Court authority under the common law of this country. And then the third point, which I wish to make, Your Honor, and I think it's especially important as to this question of new ground, is that in terms of the common law of this country, the notion that the United States government and the Department of Justice is going to prosecute a sovereign entity for conduct undertaken within the territory of the foreign sovereign is remarkable. That is clearly new ground. And the vast majority of the country- That's not exactly what we have here. The indictment alleges that a billion dollars was funneled through the banks of the United States. Obviously, part of it took place in Turkey. But the nexus to the United States is pretty clear, right? And lying to the regulators in the United States. So let's break that into two parts, Judge. I'm sorry if I'm talking over you at all. I don't mean to be. As to the alleged bank transfers, those all happened in the Turkish state, within the bounds of the Turkish Republic. The standard at common law, not only as a matter of general criminal common law, but especially in the context of sovereign immunity as reflected in the secondary statement, is that it's not a question of the effect of the conduct. It's a question of where the acts took place. And the acts that Hawk Bank is alleged to have committed in this case as part of the conduct outside of the United States, as reflected in this panel's earlier decision, those are all acts that took place within the boundaries of the Turkish Republic, at the direction of the Turkish state. I don't understand. Isn't one of the allegations that a billion dollars was funneled into the United States banks in violation of U.S. law? Not by Hawk Bank. That's the key distinction. This panel determined in the prior decision that a direct effect of the conduct in Turkey was that money briefly passed through the United States and that that figure was a billion dollars. Or at least as alleged in the indictment. But the standard, as a matter of common law, is where did the acts take place? And those acts took place not only in Turkey in general, but in particular within Istanbul. And then there are other intra-bank transfers made by other individuals. Some of that money ends up in Dubai. And then from Dubai, it ends up being sent all over the world. But the acts of Hawk Bank, taken at the direction of the Turkish state, all happen in Turkey. And then you get to, and I want to address the second part of your question, Your Honor, because we don't mean to forget about it either. There are the alleged meetings in the United States between Hawk Bank and United States Treasury Department officials. By the way, the indictment does not allege where those meetings occurred, but it's an understood principle in the record. And this panel's prior decision reflected that some of those meetings occurred in the United States. To be clear, our understanding is that they did not occur within the Southern District of New York, but that's an issue for another day if this case proceeds. But those meetings, Your Honor, would then clearly fall within the diplomatic activity exception that this court recognized as a common law in Judge Friend-Lezhini's decision, where they made clear, and this is in footnote three of that decision, that diplomatic activity is meant in a broad sense. And that case involved the Spanish government asking a lawyer from the western part of the state to increase activity pressuring the British government for its handling of human rights issues in Northern Ireland to create greater public scrutiny and pressure on that issue, so that hopefully there would be also greater pressure put on them involving Gibraltar. And if that's diplomatic activity, then certainly Hawk Bank officials meeting with U.S. Treasury officials about Turkey's compliance with an international sanctions regime is diplomatic activity as well. Can you go back to my hypothetical because, you know, Justice Kavanaugh asked this question at the argument, and I'm troubled by it as well. I just don't understand how in those types of situations we have a clear commercial entity that somehow if that entity is controlled by the government that they're immune from prosecution no matter how bad the activity is and how badly it's impacting the United States. I could give you other hypotheticals. A bank that's, you know, funneling money to a drug cartel. Overtly, you're taking the position that the United States government without Congress acting, that the executive cannot indict a commercial bank or other corporation without congressional action. And I don't know where that comes from. So first, our principal answer, Judge Biondi. You're breaking new ground to me. It's not, Your Honor, given the common law understanding of sovereign immunity. If that conduct is overseas. The basic premise of the whole deference to the executive is not to embarrass the executive. The political branches, including executive, have control of foreign relations, and courts should not be making these decisions in a way that affects those relationships and embarrasses the government. And how embarrassing is it that when something overtly affects the United States, is damaging our national security, that courts step in and tell the executive, sorry, you can't act there. That seems pretty embarrassing in the international world. The common law establishes the boundaries here. And I'd like to just read you a few sentences from Spooner Exchange, but then I'd like to go to the heart of a further response to your question, Judge Bianco. And I realize I'm running low on time, but if you'd like me to sit down, I'm happy to. You have a couple of minutes. Go ahead. Thank you. I'm not happy to, but I would if you asked me to. This language that I'm reading to you is the foundation of sovereign immunity in this country. The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. All exceptions, therefore, to the full and complete power of a nation within its own territories must be traced up to the consent of the nation itself. They can flow from no other legitimate source. That's 11 U.S. at 136 in the Spooner Exchange decision. And so to answer your question, Judge Bianco. What about the line that says, without doubt, the sovereign of the place is capable of destroying this implication of immunity? What about that line? Yes, and Chief Justice Marshall answered what he meant by that a few years later in the Brown decision where it was clear that the sovereign that he's referring to there is Congress. When it's a question of making new law and changing the customary international law, that is a— All those Supreme Court cases and Second Circuit cases that I've cited to you that all talk about the executive and the State Department, they're all wrong. Justice Marshall said in Spooner, only Congress can destroy that immunity. So all those cases that talk about the executive are just wrong. They're using overly general language. And I'd point you to the language in the Supreme Court's decision in this case as well. In the Hawkbank case before the Supreme Court, the Supreme Court cautioned that general language in judicial opinions should be read as referring in context to circumstances similar to the circumstances then before the court. And, Your Honor, we canvassed the federal courts of appeals, and I could not find, my colleagues could not find, a single case where any federal court of appeals deferred to the government in denying immunity. What happened in Hoffman and happened in Ex parte Peru and happened in many other cases is when—is that the executive branch demanded immunity, suggested immunity, and the court deferred to that judgment of the executive branch. But flipping it the other way around and instead denying immunity based on a charging decision by the executive is unprecedented. In the few cases where the common law of sovereign immunity has been implied in the criminal context, in the INRI World Arrangements case and the shipping industry case, in neither of those cases did the district courts in those cases defer to the executive branch, either the executive branch's choice to serve the subpoena or, in shipping industry, the State Department's statement that the entity in question was not entitled to immunity. It is just not done in the criminal context, because if it were, Your Honor, if it were, then there would be no such thing. Well, I don't know if you used two district court cases from the 50s to try to establish that that's what the common law was. In one of them, the court didn't address it at all. In the other one, it didn't decide it at all. In the other one, it didn't address the fact that the executive was the one who issued the subpoena. So that hardly constitutes evidence that there's a common law rule with respect to this category. If there were other cases to cite, one way or the other, in the criminal context, we would. Nobody has any cases to cite other than a French case in 2004. Right. Right. But what we have is the way courts have applied the broad language in Hoffman. And Hoffman is as broad as it gets. And what the government is asking you to do today is explode that language far broader than it's ever been applied before. We acknowledge, Your Honor, that there is broad language in some cases. But the Matar case from this court involves officials. Official immunity raises unique concerns of the executive's power under Article II. That's not present here. Questions of official immunity are not present here. This is a question of pure entity-based sovereign immunity. And to go to Your Honor's concern about embarrassing the executive, the executive branch has all the tools of international affairs, all the tools of international diplomacy, to deal with the hypotheticals Your Honor has identified. The one tool that the common law says they do not have is to indict a state-owned entity, especially for conduct undertaken within the territory of the sovereign and at the direction of the sovereign. And that's what's alleged here. And to push back on your hypothetical, Your Honor, because I do think it's important, remember the government itself alleges in this case that not only was Hawk Bank acting at the direction of Turkish government officials, but that it was acting at the direction of Turkish government officials for Turkish public purposes to expand the export statistics for the government of Turkey. And they actually allege their specific allegations about how those statistics were benefited by the alleged conduct of Hawk Bank. And I'm pointing here to paragraph 31, A34 in the appendix, and then paragraph 42. In one of the allegations, the government even says that the Turkish government officials spoke to a former Hawk Bank executive about the need to increase Turkey's gold exports, that that was the conduct that was described as being sought. All right. You have your three minutes for rebuttal. Thank you very much. Thank you, Your Honor. All right. We'll get from the government. Good afternoon. May it please the court. Assistant United States Attorney Michael Lockhart for the government. For the better part of a century, the court's approach to questions of foreign sovereign immunity under the federal common law has been clear. First, the courts look to the executive branch to see if an assertion of foreign sovereign immunity has been recognized by the executive or if the executive has declined to recognize that assertion of immunity. If the executive branch has made that determination consistent with its constitutional responsibility for foreign affairs and the interpretation and application of international and customary law, the courts follow the action of the executive. And as the Supreme Court held in Hoffman, which was discussed at some length during the appellate's argument, the judicial branch will not embarrass the political branches of government by assuming an antagonistic jurisdiction, nor will the court recognize an immunity on new grounds the government has not seen fit to recognize. Their argument is all those cases are obviously civil cases. Yes, Your Honor. And that the rules should be different in criminal cases, especially in light of the fact that they're – and, again, I think the government concedes the common law clearly provides that you can't indict a state qua state, right? So why should the same rule apply in the criminal context in light of that distinction? So there are some potential distinctions between the application of the civil law in the civil context and criminal context, I think. As the Department of Justice conceded in the Supreme Court, it is difficult to imagine the executive making a determination to charge a state qua state, especially given the customary usage against doing that. But that doesn't mean that we're dealing with apples and oranges here. And, in fact, it is quite common for similar standards to apply in civil cases and in criminal cases. I'd point the court to the district court's opinion in the Deutsches Kalas-Indikat case, which was a civil enforcement action enforcing statutes that have both criminal and civil remedies. And in that case, the State Department did not take a particular position on sovereign immunity in that case, but did articulate the department's policy that commercial entities, even if owned by a state, engaged in commercial activities should be treated like other private parties. And the court found, in light of that and in light of the history of the federal common law, that sovereign immunity did not apply in that case. And the case proceeded. If we were to adopt your position, this is a point they make in their brief, and I'm curious what your answer is to this. Essentially, because obviously the executive is always bringing criminal prosecutions, there would be no sovereign immunity at all. It wouldn't exist in criminal cases other than potentially, again, if government indicted a state. But other than that type of situation, your position, the government's position, is that the court should just defer to the executive, and therefore there would be no, by definition, no sovereign immunity whenever the government indicted an instrumentality of the state. What's your answer to that? So I would say it's not that there is no sovereign immunity. I think that the approach that we think is consistent with the case law that we're advocating here is the same approach that the courts applied in civil cases prior to the adoption of the Foreign Sovereign Immunities Act. But in civil cases, it involves other parties and the government sort of stepping in or not stepping in. Criminal prosecutions, the government's always in control. So when you say it's not that there's no sovereign immunity, it would never be able to invoke it, right? Yes, and that's because that determination, unlike in a civil case where there's been no consideration or determination of the application of Foreign Sovereign Immunity before a private civil litigant brings its case to court, that determination is already built into the decision about whether or not to bring the case in the first place. What about the instrumentality is engaged in public function? They've cited a lot of cases involving ships, railroads. Is your position the government can indict those types of entities? Do the courts have to defer on those? So I would say I would answer that in two parts. The first part is that the executive determination about the application of sovereign immunity is based on a couple of things. One is the constitutional responsibility of the executive in matters of foreign affairs and also the executive's expertise and responsibility for interpreting and applying customary international law, resolving disputes in the application of customary and international law, and determining both what the United States position is and what position it is going to advocate that other nations follow. So that application has evolved over time, and I think one of the reasons the case law can appear to take a little bit of effort to untangle is because principles of international and customary law have changed over time. And if you're looking at what the policies were in 1812, that's different from the 1920s. It's different from the 1970s. I say that to say that it is not that the executive would never make a decision to indict an instrumentality engaged in what is termed sort of sovereign or public acts, but that is not the position of the United States at this time, and that is not customary and international law at this time. I don't know if that answers the court's question. The holding of our case could open up the door to those types of prosecutions, which could be troubling from a customary international law standpoint. Suppose you had a bank who's printing money, similar to what the Treasury does. Is it your position that the government could indict a bank for that type of activity? For printing money? I'll use that as an example. Some core governmental function that's being done through some instrumentality. So I think that I do not foresee the executive making that decision, and I would point the court to the French decision. As the court noted, the one criminal case that has been drawn to the court's attention by the parties where the French courts applied sovereign immunity to the Maltese corporation, not because it was entitled to absolute immunity from criminal process and criminal prosecution, but because applying the kinds of traditional principles that the executive applies and that have been applied in the case law, that Maltese corporation was acting as a regulator and not as a commercial entity, and sovereign immunity applied there. We think that that case was correctly decided. Mr. Williams' argument is that that one is not always as clear. His argument is in this very case there's allegations that Turkish officials are involved in various components of what the government is alleging with respect to this scheme, and that you have elements of public function. What's your response to that? So I think as the Supreme Court observed in Weltover, it can be difficult at times to draw the line between what is a commercial act and what is a noncommercial act, but that is a line that the courts have drawn over and over and over again, and I would submit that in this case it is not particularly difficult. This court certainly had no difficulty in concluding that the commercial activities exception under the Foreign Sovereign Immunities Act applied initially. Justice Gorsuch concurring. Similarly, it had no difficulty concluding that the commercial activities exception is applied. So that's not something we should defer the executive on. In other words, whether or not something qualifies as something essentially as a public act of the government or commercial activity is something the court should decide, not defer the executive on? So I would submit to the court that as we have argued, the rubric that has been applied and that the court should apply here is that if the executive has made that determination consistent with its responsibilities for foreign policy and for international law, the court should defer to that decision. I think even if the court were to apply some Yusuf versus Samantar level of strong deference, as Hulkbank advocates, the court should reach the same result in this case, both because of deference to the executive decision and because notwithstanding the bank's arguments and the government of Turkey's arguments in its amicus brief, this conduct is so clearly commercial. It's commercial under the analysis set forth by the Supreme Court in Weltover and in Alfred Dunhill. Hulkbank has argued that there is a different and narrower commercial activities doctrine under the pre-Foreign Sovereign Immunities Act case law. And I would submit to the court that Weltover directly answers that question. And Weltover says no, the Foreign Sovereign Immunities Act codified the restrictive theory of sovereign immunity, especially with respect to the commercial activities exception, and that case law under the federal common law of foreign sovereign activities immunity can be resorted to to interpret what activity is commercial and what activity is not commercial. And Weltover focused in particular on the Alfred Dunhill case, which was decided the same year that the FSIA was enacted but prior to its enactment. What about the argument regarding the location of the acts here that are deemed to be criminal being located within the sovereign? First of all, do you agree with that? And is that dispositive, if it's true? It is neither dispositive nor accurate in this case. There is conduct both physically in the United States in the form of Turkish officials meeting with United States Treasury officials for the purpose of concealing and promoting the money laundering and sanctions evasion scheme. There are emails and phone calls from Turkey to the United States for the same purpose. It is true that the specific bank transfers often took place within Turkey. They took place within Turkey in coordination with Halk Bank's co-conspirators as part of an integrated, and specifically through the United States financial system, principally first through Dubai and then out through the world, including through the United States. So that is all commercial activity. I would submit that the direct effects test as enacted under the FSIA, as the Supreme Court has held, is a codification of the restrictive theory as it applied at the time of its adoption and is the scope of the exception that we are advocating here. Secondly, I would note that Halk Bank is relying on essentially victory transport and Haney for the diplomatic activities exception to commercial activity. That doesn't apply under the analysis in Weltover and Alfred Dunhill. Even if it did apply, there's no question that Halk Bank's discussions with U.S. Treasury officials was not diplomatic activity. These are the same types of meetings that U.S. Treasury officials and OFAC officials have with commercial banks all over the world, including Halk Bank. There is nothing sovereign or public or diplomatic about those meetings. I want to make sure we cover all the things that came up at the Supreme Court argument. Justice Sotomayor, I think, has a series of questions about state prosecutors and whether or not this could be opening a door to these types of prosecutions being brought state by state and what the government's position with respect to whether or not a state could do that and whether they could be stopped. So we don't think that it does open that door. The first reason why it doesn't open that door is because under the Hoffman approach to sovereign immunity, there will be an executive recommendation about whether immunity does or does not apply. And if there's a decision that state court prosecutions against foreign state-owned instrumentalities should not proceed, we would expect that there would be deference to that decision. So the Department of Justice would intervene in any state prosecution, state that we think immunity should apply here, and that would be respected. I think as a practice. At least by the federal courts. That is our expectation of how that would play out. It is our understanding that it is routine when there is some sort of legal action in the United States affecting either a foreign state or its interests. It is routine for that foreign state to draw that to the attention of the State Department through diplomatic channels. So these actions would not go unnoticed. The executive would have an opportunity to make a suggestion of immunity or absence of immunity to the state courts. And as a matter of supremacy, the federal common law would apply, and the constitutional prerogative of the executive with respect to foreign affairs would apply. And we think that that would help. What about – it was raised in the papers about a separation of powers issue. Mr. Williams suggested today that Congress is the one that would have the responsibility of creating some type of legislation with respect to immunity in this realm. What's your response to that? There is no doubt that Congress can step in and enact a positive law approach to resolving these questions. Congress has done that in two instances. It has done that with respect to civil actions in the Foreign Sovereign Immunities Act. It has done that with respect to diplomatic immunity. It has not done that with respect to, for example, head of state immunity, foreign official immunity, or here foreign sovereign immunity in the context of a criminal case. And I think that the appellant has relied on schooner exchange, establishing this principle both of absolute criminal immunity and this principle of locating responsibility for immunity with Congress. And I'd just like to point again to what Justice Marshall said that Your Honor pointed out, and then the following sentence. Without a doubt, the sovereign of the place is capable of destroying this implication, the implication of sovereign immunity. He may claim and exercise jurisdiction either by employing force or by subjecting such vessels to the ordinary tribunals. I think what Justice Marshall says there is clearly referring to executive authority. Congress doesn't apply force. That's a reference to the executive police power. We suggest that includes things like criminal prosecution. And so that concept has been embedded in this case law from its very inception. All right. Thank you. Judge, can I ask you a question? Yes, sure. Go ahead, Judge Caron. Shortly. Counsel, I draw your attention to the paragraph, the credo paragraph in our conclusion when this case first appeared. It's very simple. Paul Cabana, instrumentality of a foreign sovereign is not entitled to immunity from criminal prosecution at common law. So I think we can say that the indictment here, that we have already held that the indictment here is consistent with customary international law as it already exists. Right? Is that a fair statement? Yes, Your Honor. I agree with that. Mr. Williams suggests that our decision under the common law was unprecedented. How would you answer that? So I would answer that, that it is unprecedented only in the very narrow sense that that the appellant is focused on, which is that it is true that there has not been a judicial decision addressing the circumstances of this case. It is unprecedented in that sense. I think, first of all, there are good reasons for that, that show that it doesn't support the appellant's position. And I think more importantly, the implication of that actually cuts quite strongly against the appellant's position. The reason that there has not been a case like this is in some ways parallels the reason why there were not restrictive immunity cases until the 20th century. It's because the nature of foreign states, the nature of sovereign affairs changed. And as it changed, customary and international law changed, the executives' policies with respect to sovereign immunity changed to reflect the way that the world itself was changing. The reason that there not have been cases like this before is because Halk Bank's conduct, frankly, is unprecedented. For a foreign commercial bank, one that is majority owned by the state of Turkey, to launder billions and billions of dollars of money for the National Iranian Oil Company, which is an agent or affiliate of the IRGC, to deceive banks, to lie to U.S. Treasury officials, that conduct is unprecedented. One of the anarchist briefs suggested the reason this hasn't come up before is because around the world it's usually thought of that you don't indict, that companies aren't natural persons that are capable of indictment. Isn't that why this really hasn't come up before, that that is a peculiarly American concept but it's just not done around the world? Isn't that the reason? So I would say it's actually – here's a way in which this actually is precedented. The United States government has indicted state-owned companies before. It has involved state-owned companies in criminal prosecutions before this case. It hasn't resulted in a judicial decision directly addressing whether or not sovereign immunity applies. But in the Statoil case, in the Armacor case, in the nuclear power case in Tennessee, the executive has in other cases decided to indict foreign state-owned companies. And I think the implication to be drawn from that, the fact that there is no discussion of foreign sovereign immunity in those cases, is because it reflects the party's, the United States' understanding and the foreign government's understanding that under customary and international law, immunity did not apply in those situations. And that's why it wasn't addressed. So there is precedent for these charges. No, there has not been a direct judicial decision addressing sovereign immunity. The implication to be drawn from that, I think, is the point Judge Bianca, you made earlier, which is under Hoffman, immunity applies if there is an established policy of recognizing the immunity. Here it is clear by conduct that the United States executive has not recognized immunity in these situations. And the courts also have not recognized immunity in these situations. So it's fair to say that the indictment itself constitutes the action of the executive for these purposes? I would agree with that, Your Honor. Thank you. All right, Mr. Williams, you have three minutes and rebuttal. Thank you, Your Honor, and may it please the court. My colleague on the other side began, well, ended his presentation with a discussion of various plea bargains. But be not mistaken, this court's decision will be read and understood around the world. I've just spent weeks reading international decisions that cite to this court's Victory Transport case, which has been cited in Australia and in a House of Lords case from 1981. The Heaney case, cited in Hong Kong decisions. What this court decides on the common law of sovereign immunity in criminal cases will have international effects. Plea bargains don't. The Second Circuit's decision does. And part of the reason why we're here is that before the Supreme Court, it became clear that the government's position on deference was incoherent and led to absurd results. The government did not only admit that it would not indict a sovereign. It also acknowledged that government-owned corporations would be immune from indictment for their sovereign actions. That's A201 of the Special Appendix. If that's the case, if the common law bars that kind of prosecution, how did they get to say that when they are indicting somebody for following the direction of the Turkish state to increase Turkish export figures, that that's not a public function? The standard on itself collapses, especially when the government itself acknowledged that when it had deference at common law, it did not handle that deference well. If deference does not work, and the only thing that the government points to in terms of deference is its charging decision, as Judge Cabranes just asked. So they're not pointing to a standard. My colleagues on the other side say, trust us. We consider the standards of customary international law. Trust us. This is consistent with norms of common law sovereign immunity. I'm afraid we don't. I'm afraid that we say that the common law of sovereign immunity would recognize this prosecution as unprecedented, that it targets public acts of the Turkish state directed to a Turkish sovereign institution done in the Turkish Republic. It does not get more sovereign than that. And the government's response is only to say, we've considered it, and the fact that we've indicted means that you should defer to us. That is simply not good enough. I'd ask the tribunal to look. Of course, Judge Cabranes. What would be good enough that is beyond the indictment? What is it that the executive might have done to meet the standards that you're suggesting? Well, for one thing, Judge Cabranes, it could have presented a case that was more consistent with international norms, customary international law, and the common law of this country. But it is the government that has indicted this case. Let me put it another way. Beyond the indictment, if the Department of Justice had included appropriate language or an announcement indicating that its action was consistent with the views of the Department of State or of the president, in the way the memorandum from the old Bureau of the Budget or OMB said a particular action was consistent with the president's program. So if there were such a statement, that would solve your problem, right? I think it would need to be more than that, Judge Cabranes. You're right that that would certainly help, and that's not present here. We don't have any statement of policy by the Department of State, which is what's been looked to in the past. We don't have that here at all. If there was a statement as to why it was consistent, we would be a lot closer than we are here. But my colleague on the other side quoted from language from the Schooner Exchange decision. There are lots of statements in the Schooner Exchange opinion. I recognize that. But the sentence following what he read is particularly important. When he said that the sovereign can change the prescription and the bounds of sovereign immunity, what Chief Justice Marshall then said needs to be heated. Until such power be exerted in a manner not to be misunderstood, the sovereign cannot be considered as having imparted to the tribunals a jurisdiction which it would be a breach of faith to exercise. That's exactly what the government has done here. It has presented an indictment. The indictment itself alleges public acts, sovereign functions, and says, never mind. We've indicted. We therefore get to prosecute. That is not the law of sovereign immunity. At common law, it goes against the standards announced in Schooner Exchange. It violates core principles of divided government. And the Medellin case from the Supreme Court, where the government tried again to try, and even then, they were trying to act consistently with an ICJ opinion and a treaty that was pending. That wasn't good enough. Congress has to act, and Congress has not acted. This is a case that targets official conduct within the bounds of a foreign sovereign. The indictment should be dismissed. All right. Thank you, Mr. Williams. Thank you, Mr. Lockhart. We'll reserve a decision. Have a good day.